IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JOSEPH GANDER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.  05-6229-TC |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICER DARRELL WOOD, | ) | ORDER |
| OFFICER DORI DAMMER, | ) | |
| SERGEANT VINCENT WAN, | ) | |
| POLICE DEPARTMENT OF CITY OF | ) | |
| SALEM, OREGON, and THE | ) | |
| CITY OF SALEM, OREGON, | ) | |
| | ) | |
| Defendants. | ) | |

COFFIN, Magistrate Judge.

Presently before the court is defendants' motion (#46) for summary judgment.

Standards

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of

fact to be tried. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. <u>Id.</u> at 323-24. There is also no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986); <u>Taylor v. List</u>, 880 F.2d 1040 (9th Cir. 1989).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. <u>Hector v. Wiens</u>, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Valadingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. <u>Sankovitch v. Insurance Co. of North</u>

America, 638 F.2d 136, 140 (9th Cir. 1981).

Discussion

Defendants' motion for summary judgment is allowed to the extent that plaintiff's negligence claims are dismissed. Plaintiff has provided no opposition to defendants' persuasive state statutory immunity arguments.

The remainder of the motion for summary judgment is denied at this time. The record in this case simply does not lend itself to summary judgment. As discussed below, defendants' own description of the underlying conduct involved is vague (and partly conflicting), and it would be better to proceed to a full trial because in the circumstances of this case a fuller record will afford a more substantial basis for decision. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986); Anderson v. Hodel, 899 F.2d 766, 779-71 (9th Cir. 1990).

Even if I were to accept defendants' version of events at face value -- which is the opposite of the standard to be applied at this stage of the proceedings[1] -- it is far from clear on this record what exactly transpired on July 31, 2003, that led to the use of force applied by the police canine on Joseph Gander.

What is manifest is that Gander was suffering a psychotic episode when he went to his neighbor's house, at about 2 a.m., clad only in his underwear, and broke a window to get their attention.

---

[1]In ruling on defendants' motion for summary judgment, the court must draw all inferences in favor of plaintiff. See Valadingham, supra.

3 - ORDER

The neighbor summoned the police, and three Salem police officers (officers Darene Dammer, Darrell Wood, and Sgt. Vincent Wan) responded to the scene.  Wood was in command of a police dog, "Ivon."

The officers had been notified by dispatch that Gander was mentally unstable.  When they arrived, they observed that he was agitated and incoherent.  Apparently, Gander at one point was on his neighbor's porch, but left the porch when police ordered him away and went in the yard between his house and his neighbor's house.  An officer ordered him to lie prone on the grass, face-down.  Gander approached officer Dammer and then, according to the report of Officer Wood, "abruptly complied and went to the ground about 10 feet away from Officer Dammer."  However, before the officers could reach him and take him into custody, Gander "quickly jumped into a standing position."  This was followed by Gander again being ordered onto the ground, which he did, only to jump up again to a standing position.  Wood's report describes this sequence being repeated approximately eight times.  At one point, Wood describes Gander as approaching Dammer and that he "grabbed for her."  In her report, Officer Dammer describes Gander as "rambling and lunging toward me."[2]  The officers applied pepper spray on plaintiff to no apparent effect.  In his report, Sgt. Wan states, "I told Officer Wood he could deploy his K-9 when he felt it was appropriate as lesser force had failed in gaining any

---

[2]It is unclear whether the "lunging" and the "grabbed for" descriptions involve the same movement.

compliance from the suspect." Wan further states, "Gander lunged towards Officer Dammer and myself and Officer Wood deployed his K-9."

In his deposition testimony, Sgt. Wan described the officers as forming a circle around Gander to contain him in the yard. He further testified that he informed Officer Wood "he could go ahead with his K-9 which he had given warning that he would release the K-9 if Mr. Gander did not do what he had already been told many, many times to do, which was to get on the ground and stay on the ground and put his hands out from his side."

The use of "Ivon" to subdue Gander resulted in significant dog-bite injuries to plaintiff's right arm and right leg.[3]

The issue in this case boils down to whether the officers were justified in using a police dog to subdue Gander under the circumstances herein. In this regard, it is noteworthy that, in his deposition testimony, Officer Wood, the canine handler, testified that he would not place the use of a canine on a force continuum spectrum (which sets forth methods of control ranging from mere presence and verbal skills through physical contact, up to and including lethal force) because he does not consider a police dog to be a "weapon" but rather a "searching tool." Given the severity of Gander's injuries, I find such a disconnect

_____

[3] Officer Wood's report describes Gander's injuries as "significant lacerations" and relates that "Ivon" had blood and small pieces of flesh all over his face, chest, on the e-collar around his neck, and smeared on his harness. Photos of the wounds as well as a statement from the treating physician confirm the severe nature of the injuries.

disturbing.  Obviously using a dog to seize a suspect by biting him
involves  the  application  of  force,  and  such  seizures  merit
discussion,  consideration,  and  training,  along  with  the  other
options on the continuum.

We  are  guided  here  by  the  factors  set  forth  in  <u>Graham v.</u>
<u>Connor</u>,  490  U.S.  386,  109  S.  Ct.  1865  (1989).    The  officers'
actions  are  measured  by  the  standard  of  objective  reasonableness.
<u>Graham</u>,  490  U.S.  at  397.    The  reasonableness  of  the  force  used  to
effect  a  particular  seizure  is  determined  by  "carefully  balancing
.  .  .  the  nature  and  quality  of  the  intrusion  on  an  individual's
Fourth  Amendment  interests  against  the  countervailing  governmental
interests  at  stake."    <u>Id.</u>  at  396.    "[T]he  force  which  is  applied
must  be  balanced  against  the  *need*  for  force."    <u>Liston v. County of</u>
<u>Riverside</u>,  120  F.3d  965  (9th  Cir.  1997)  (quoting  <u>Alexander v. City</u>
<u>and County of San Francisco</u>,  29  F.3d  1355,  1367  (9th  Cir.  1994)).

It  cannot  be  fairly  disputed  that  the  force  applied  in  this
case  resulted  in  significant  or  serious  bodily  injuries  to
plaintiff.    I  am  mindful  that  in  a  case  decided  subsequent  to  the
seizure  of  Gander,  the  Ninth  Circuit  changed  its  definition  of
"deadly  force"  to  encompass  force  which  creates  a  substantial  risk
of  causing  death  <u>or  serious  bodily  injury</u>."    <u>Smith v. City of</u>
<u>Hemet</u>,  394  F.3d  689,  706  (9th  Cir.),  <u>cert.  denied</u>,  125  S.  Ct.  2938
(2005)  (emphasis  supplied).    However,  because  this  definition  was
adopted  subsequent  to  the  events  herein,  I  will  not  apply  a  "deadly
force"  analysis  to  the  decision  to  deploy  a  canine  on  Gander.

That  said,  the  use  of  the  dog  and  the  resulting  injuries  to
6 - ORDER

Gander was a level of intrusion on plaintiff's Fourth Amendment interests that was significant and reflects a quantum of force that created a substantial risk of serious bodily injury regardless of whether such could be characterized as "deadly force" at the time.

In Graham, the Supreme Court indicated the relevant factors in the Fourth Amendment reasonableness inquiry include, "1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

In Deorle v. Rutherford, 272 F.3d 1272, 1282-83 (9th Cir. 2001), cert. denied, 536 U.S. 958 (2002), the court instructed that the mental illness of a suspect is also a factor to be considered in determining the reasonableness of the force employed.

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increased use of force may, in some circumstances at least, exacerbate the situation, in the latter, a heightened use of less than lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. See Alexander, 29 F.3d at 1366 (holding that the police used excessive force, considering all the circumstances, in "storm[ing] the house of a man they knew to be a mentally ill . . . recluse who had threatened to shoot anybody who entered") . . . Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact the officers are confronted, not with a person who has committed a serious crime against

7 - ORDER

others, but with a mentally ill individual.  We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals.  Instead, we emphasize that where it is or should be apparent to officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under <u>Graham</u>, the reasonableness of the force employed.

Applying the above factors to the instant case, the record establishes:

1.    The police knew that Gander was mentally unstable.

2.    It was obvious that Gander was unarmed, as he was clad only in his underwear, and any weapon would have been readily visible.

3.    The severity of the crime at issue was relatively minor.  Gander was trespassing and creating a disturbance at his neighbor's house, where he had broken a window.

4.    Gander was "resisting" arrest to the extent he was not complying with the officers' commands to assume a prone position on the ground and stay there.  On the other hand, he went down on the ground prone 8 or 9 times in response to their commands, which reflected at least some degree of responsiveness on his part.

5.    Flight, while always a possibility, does not seem to have been an issue.  Gander was a nearly naked, mentally ill individual who was essentially running in circles in the yard next to his home.

6.    Whether Gander was a threat to the physical safety of the officers and whether such a perceived threat was the reason for deploying the dog is uncertain from the record before me at this time.  There is no evidence in the record that Gander was verbally threatening the officers, and the descriptions of his physical activity are vague to say the least.

Had Gander been wielding a weapon (coupled with his noncompliance), had he tackled an officer, or had he attempted to otherwise assault an officer, the threat factor would be

8 - ORDER

satisfactorily established.

But the officers' description of Gander's actions do not present those scenarios. The reports and deposition excerpts describe the actions of an agitated, mentally disturbed individual encircled by the police, who alternatively complied with their commands to drop to the ground only to then jump up and resume darting about the yard. What is a "lunge" or a "grab" motion given that the police are encircling an agitated, mentally disturbed individual? Almost any movement towards the officers, especially if they are closing in, could be described as a lunge. Virtually any movement of the arms under the circumstances could be described as an attempt to grab.

Beyond the semantical nuances, there is certainly room on this record for the jury to discredit the "threat factor" as the basis for the decision to unleash the dog. Both in his report and in his deposition, Sgt. Wan provides support for the proposition that the decision to deploy "Ivon" was based solely on Gander's noncompliance with the verbal commands to go to the ground and stay there (". . . go ahead with his K-9 which he had given warning that <u>he</u> <u>would</u> <u>release</u> <u>the</u> <u>K-9</u> <u>if</u> <u>Mr.</u> <u>Gander</u> <u>did</u> <u>not</u> <u>do</u> <u>what</u> <u>he</u> <u>had</u> <u>already</u> <u>been</u> <u>told</u> <u>many,</u> <u>many</u> <u>times</u> <u>to</u> <u>do,</u> <u>which</u> <u>was</u> <u>get</u> <u>on</u> <u>the</u> <u>ground</u> <u>and</u> <u>stay</u> <u>on</u> <u>the</u> <u>ground</u> . . .") (deposition testimony of Sgt. Wan, emphasis added). There are also other inconsistencies in the officers' descriptions of Gander's conduct that raise questions regarding the threat factor. In his deposition, for example,

Officer Wood stated he thought lethal force might have to be used,
"[b]ased on [Gander's] attack of Sergeant Wan who is armed with a
pistol."  Wan, however, does not mention any "attack" on him by
Gander, but only references the "lunging" motions.  In his report,
Wood describes an "attempt to attack" as "running towards the two
officers while flailing his arms wildly."  Again, those
descriptions are too vague to support summary judgment and a fuller
record is necessary to clarify the reasons that led to the
deployment of "Ivon."

Given all the factors to be considered in determining the
reasonableness of the force used to effect a seizure, I certainly
cannot accept that, as a matter of law, the police are justified in
using a canine to bite and seriously injure an unarmed, mentally
disturbed individual simply because he fails to respond to their
verbal commands to lie down.[4]

Further, plaintiff has submitted the declaration of Craig
Ziegenhagel, a professional dog trainer as well as police K-9
trainer, in opposition to defendants' motion for summary judgment.
In part, Ziegenhagel states:

> 8.   Based on my review of the depositions and police
>      dispatch reports, I see no evidence of any attempts
>      to calm Mr. Gander through conversation, which is a
>      common tactic used by police as the first method
>      used to calm agitated persons.  Only after doing so
>      does the well-trained police officer resort to

---

[4]For the same reason, I also deny defendants' summary judgment
motion on qualified immunity grounds.  The principles enunciated in
Graham, supra, and its progeny, such as Deorle v. Rutherford, were
well established at the time of these events.

10 - ORDER

physical contact.  If you must subdue an agitated
subject you would then resort to less severe and
potentially injurious methods such as certain
holds, takedown methods, pepper spray, use of
additional officers using their combined force, and
batons, before releasing the canine.

9.    The defendant[s'] characterizations found in the
police reports and/or depositions of Mr. Gander's
movement and activity at the scene are questionable
interpretations based upon inherent inconsistencies
found in the same material.  They are simply too
numerous to recount in detail.  However, "lunging"
is an example of such an interpretation.  The
nature of Mr. Gander's movements is open to
question based upon the admitted distances between
the subject and the police officers, the three
police officers' disparate descriptions and their
established reaction to the movement.

This declaration is similar to that of an expert in Smith v. Hemet,
supra, wherein the court noted that "[a] rational jury could rely
upon such evidence in assessing whether the officers' use of such
force was unreasonable."  394 F.3d at 703.

    To repeat, I cannot conclude as a matter of law that it is
reasonable to use a police dog to inflict serious bodily injuries
on a mentally ill suspect who committed relatively minor property
offenses simply because he is agitated and noncompliant to the
verbal commands of the police.  Because I cannot tell from this
record exactly what the actions were that the police described as
"lunging," I cannot conclude whether the police reasonably
perceived Gander to be a threat to their physical safety or whether
the dog was released based solely on plaintiff's noncompliance.

    Defendants' motion for summary judgment on Count I (42 U.S.C.
§ 1983 Against Individual Defendants) and Count II (42 U.S.C. §

1983 Against Police Department of the City of Salem and City of Salem) is DENIED. Defendants' motion for summary judgment on Count III (Negligence Claim Against Police Department of City of Salem and City of Salem, Oregon) and Count IV (Negligence Claim Against Individual Defendants) is GRANTED.


DATED this _____13ᵗ_____ day of October, 2006.

                                   _____
                                        THOMAS M. COFFIN
                                   United States Magistrate Judge